UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES SHOUP,

    Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant,
_____/

Case No. 1:16-CV-581

HON. ROBERT J. JONKER

## OPINION

This is a social security action brought under 42 U.S.C. § 405(g) seeking judicial review of a final decision by the Commissioner of the Social Security Administration (Commissioner). Plaintiff seeks review of the Commissioner's decision denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.

## STANDARD OF REVIEW

The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). The Court may not conduct a *de novo* review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the

facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Health & Human Servs.*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984). The substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

**PROCEDURAL POSTURE**

Plaintiff was fifty-one years of age as of his alleged disability onset date. (PageID.100.) He has earned an Associate's Degree, and has previously been employed as a print unit technician, a roll room technician, a palletizer, and as a material handler. (PageID.62, 72–74.) Plaintiff applied for benefits on October 29, 2013, alleging disability beginning May 6, 2013, due to PTSD, bipolar disorder, depression with suicide attempts, HIV, osteoarthritis, post left hip arthroplasty, anxiety, and chronic insomnia with night terrors. (PageID.100–101, 170–171.)

Plaintiff's application was denied on April 16, 2014, after which time he requested a hearing before an ALJ. (PageID.114–119.) On August 21, 2015, Plaintiff appeared with his counsel before ALJ James Prothro for an administrative hearing with testimony being offered by Plaintiff and a vocational expert (VE). (PageID.53–98.) In a written decision dated December 28, 2015, the ALJ determined that Plaintiff was not disabled. (PageID.32–52.) On March 21, 2016, the Appeals Council declined to review the ALJ's decision, making it the Commissioner's final decision in the matter. (PageID.25–30.) Plaintiff subsequently initiated this action under 42 U.S.C. § 405(g).

## ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. § 404.1520(a-f).[1] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. § 404.1520(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining the claimant's residual functional capacity (RFC). *See* 20 C.F.R. § 404.1545.

---

[1]
1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. § 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. § 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. § 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. § 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed. (20 C.F.R. § 404.1520(f)).

Plaintiff has the burden of proving the existence and severity of limitations caused by his impairments and that he is precluded from performing past relevant work through step four. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). At step five, it is the Commissioner's burden "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Id.*

ALJ Prothro determined that Plaintiff's claim failed at the fifth step of the evaluation. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged disability onset date. (PageID.37.) At step two, the ALJ determined Plaintiff had the severe impairments of: (1) left hip osteoarthritis status-post hip arthroplasty; (2) obesity; (3) HIV positive; (4) an affective disorder; and (5) an anxiety disorder. (PageID.37.) At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled the requirements of the Listing of Impairments. (PageID.38–40.) At the fourth step, the ALJ determined Plaintiff retained the RFC based on all the impairments:

> to perform light work as defined in 20 CFR 404.1567(b) except he can occasionally climb and balance. He is limited to simple, repetitive tasks, one to two step tasks, and no fast-paced work.

(PageID.40.) Continuing with the fourth step, the ALJ found that Plaintiff was unable to perform any of his past relevant work. (PageID.46.) At the fifth step, the ALJ questioned the VE to determine whether a significant number of jobs exist in the economy that Plaintiff could perform given his limitations. *See Richardson*, 735 F.2d at 964. The VE testified that Plaintiff could perform other work as a routing clerk (7,500 regional positions), general clerk (8,000 regional positions), and as an office helper (8,000 regional positions). (PageID.94–95.) Based on this record,

the ALJ found that Plaintiff was capable of making a successful adjustment to work that exists in significant numbers in the national economy. (PageID.47.)

Accordingly, the ALJ concluded that Plaintiff was not disabled from May 6, 2013, the alleged disability onset date, through December 28, 2015, the date of decision. (PageID.47–48.)

## DISCUSSION

**1**.     **The ALJ's RFC Discussion.**

As noted above, the ALJ found that Plaintiff was capable of performing a limited range of light work. Plaintiff claims the ALJ erred here in three respects: first, by failing to include a limitation for the use of a cane, second, by failing to follow SSR 96–8p, and third by failing to include the moderate restrictions on Plaintiff's mental capabilities offered by the agency reviewer. The Court disagrees.

A claimant's RFC represents his ability to perform "work-related physical and mental activities in a work setting on a regular and continuing basis," defined as "8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96–8P, 1996 WL 374184 at *1 (SSA. July 2, 1996); *see also Payne v. Comm'r of Soc. Sec.*, 402 F. App'x 109, 116 (6th Cir. 2010). RFC is the most, not the least, a claimant can do despite his impairments. 20 C.F.R. § 404.1545(a); *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007). At this point, the burden remains on Plaintiff to demonstrate a disability. 42 U.S.C. § 423(d)(5)(A).

    *A.*     *Use of a Cane.*

Plaintiff first argues that the ALJ should have found he requires the use of a cane to ambulate. SSR 96–9p governs under what circumstances an ALJ is required to include a limitation for a hand-held assistive device, such as a cane. In relevant part the ruling states:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case.

SSR 96–9p, 1996 WL 374185, at *7 (July 2, 1996). While the evidence demonstrates that Plaintiff may have temporarily required the use of a cane during the period leading up to, and immediately following, the surgery on his left hip, the evidence provided by Plaintiff demonstrates he no longer requires the use of a cane, and furthermore that, to the extent Plaintiff required the use of a cane to ambulate in the past, such limitation lasted less than twelve months.

On June 12, 2013, Plaintiff visited Dr. Michael Dandois, his treating physician, complaining of persistent lower back and hip pain for the last month. (PageID.481.) Plaintiff had used Ibuprofen, heat, ice, rest, and stretching without experiencing pain relief. (PageID.481.) While x-rays of Plaintiff's lower back were "overall, o.k" there was "some significant [osteoarthritis] changes" in Plaintiff's left hip. (PageID.482.) Dr. Dandois referred Plaintiff to Dr. Bernard Roehr, an orthopedic surgeon. (PageID.482.) Plaintiff met with Dr. Roehr on August 7, 2013. Plaintiff stated he had experienced hip pain since 2006, but he had not used any assistive devices. (PageID.296.) Plaintiff felt that the pain interfered with his ability to do "grunt work" jobs, but still thought he could do his regular job. However, he had been off work since June. (PageID.296.) Dr. Roehr reviewed Plaintiff's x-rays and found "end state osteoarthritis of the left hip. There is bone on bone contact in the dome area and mild flattening of the femoral head." (PageID.298.) He concluded that Plaintiff was "a good candidate" for hip arthroplasty. The surgeon noted that if all went well, Plaintiff would be in the hospital for three or four days, and would require crutches for

six weeks before "weaning himself" from that support. (PageID.298.) Plaintiff elected to undergo surgery. (PageID.299.) A few days later, on August 13, 2013, Plaintiff returned to Dr. Dandois. Though Dr. Dandois' treatment note is cursory, it appears Plaintiff was given a prescription for the use of a cane, adjustable or fixed, with a tip. (PageID.479.) This appears to be the earliest mention of a cane in the record.

Plaintiff underwent a left total hip arthroscopy without complications on September 30, 2013. (PageID.314.) It appears that after his surgery Plaintiff initially used a walker to assist ambulation. (PageID.417.) By his six-week postoperative checkup on November 13, 2013, however, Plaintiff was using a cane to ambulate. (PageID.440.) At that six-week checkup, Plaintiff reported to Dr. Roehr that his hip was "doing great" and he had much less pain. He was not taking any pain medications, and reported pain only with long walks or heavy activity. He was able to walk six blocks. (PageID.440.) On exam, it was noted there was a mild Trendelenberg limp present, but there was no edema or swelling. (PageID.442.) Dr. Roehr recorded that he was "pleased" with Plaintiff's progress and encouraged Plaintiff to begin weaning himself from the cane for support. Dr. Roehr prescribed strengthening exercises, and scheduled a follow up visit in six months. (PageID.443.) The next mention of Plaintiff's ability to ambulate is recorded on May 5, 2014, less than seven months after Dr. Dandois first prescribed a cane to Plaintiff. Plaintiff was seen by Dr. Pimpawan Boapimp, M.D., at the Western University of Michigan School of Medicine Clinic. At this visit, Plaintiff discussed a variety of ailments, both physical and mental, with Dr. Boapimp. Relevant here is Plaintiff's report that he had some remaining discomfort in his left hip, but the pain was much better than before the surgery. He was exercising every day, and three times a week he would lift weights using both of his legs for thirty minutes and bike for another thirty minutes.

(PageID.534.) During this visit, Dr. Boapimp performed a physical examination and noted that Plaintiff "can walk without any problems and without a walker or a cane." (PageID.536.) A little over six months later, on September 24, 2014, Dr. Boapimp performed another physical examination and again found a normal gait. (PageID.531.) And after another six months, on March 11, 2015, Plaintiff reported he was biking and walking a dog for exercise. (PageID.519.)

In sum, it is plain that Plaintiff required the use of a hand-held assistive device between his August 13, 2013, visit with Dr. Dandois and his November 13, 2013, checkup with his surgeon. Thereafter, however, he was told to wean himself off from the use of the device, and by March of the following year (if not sooner), Plaintiff did not require the use of cane to ambulate. Furthermore, record evidence continues to show Plaintiff had a normal gait and was able to walk unassisted. Plaintiff's temporary use of the cane was not long enough to meet the twelve-month threshold for disability based on the cane alone. *See* 20 C.F.R. § 404.1509; *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir.1990); *Ford v. Comm'r of Soc. Sec.*, No. 13-CV-14478, 2015 WL 1119962, at *2 (E.D. Mich., Mar. 11, 2015). And the records discussed above fail to support Plaintiff's assertion that he continues to require the use of a cane to ambulate. To the contrary, they are consistent with the ALJ's conclusion that Plaintiff retains the capacity to perform a limited range of light work, and the ALJ properly did not include use of a cane as a limit in his RFC. This claim of error is rejected.

        B.       SSR 96–8p.

With respect to mental abilities, the regulations provide that:

> When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental

> activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce your ability to do past work and other work.

20 C.F.R. § 405.1545(c). Plaintiff argues that the ALJ's RFC discussion regarding his mental impairments fails to fulfill the requirements of SSR 96–8p, specifically by failing to satisfy the ruling's "narrative discussion" requirement. (PageID.853–854.)

According to SSR 96–8p, the RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96–8p, 1996 WL 374184, at *7. The ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved," discuss "why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence," "consider and address medical source opinions," and "[i]f the RFC assessment conflicts with an opinion from a medical source . . . explain why the opinion was not adopted." *Id.*

The portion of the ALJ's opinion dealing with the RFC assessment spans over five pages and includes a summary of Plaintiff's testimony, the ALJ's credibility analysis, a discussion of the medical evidence, and a summary of the opinion evidence. After discussing these records, the ALJ concluded:

> In sum, the above residual functional capacity assessment is supported by the claimant's positive response to his medications; his good activities of daily living; and the record as a whole.

9

(PageID.46.) The Court finds this narrative, combined with the detailed discussion of the medical evidence, to be sufficient.

Moreover, there is plainly substantial evidence to support the ALJ's RFC decision on this issue. Plaintiff has longstanding PTSD, ADD, anxiety, and depression stemming from childhood abuse. (PageID.519.) However, he managed these issues and functioned reasonably well throughout much of his adult life. He suffered disruption and increased severity in his symptoms in 2012-2013, after an HIV diagnosis and a new treatment regimen for it. (PageID.304.) This negative spiral culminated in an October 2013 apparent suicide attempt and hospitalization because of it. But that does not end the story. The medical record reflects steady recovery and stabilization following the hospital stay. Within weeks of release, he was making good progress toward his goals. (PageID.501.) The following two records noted partial remission of depression (PageID.471) and appropriate insight (PageID.473.) By March of 2014, Plaintiff reported ongoing issues, but was overall stable and happy. (PageID.534.) Six months later, he reported various medications were helping. (PageID.527.) The general trajectory continued into 2015. (PageiD.525, 590–591.) The ALJ's RFC appropriately accounts for all this.

While Plaintiff would apparently prefer a more detailed analysis, that is not what is required by the Sixth Circuit. *See Delgado v. Comm'r of Soc. Sec.*, 30 F. App'x 542, 547 (6th Cir. 2002) (finding that SSR 96–8p does not require ALJs to produce a detailed function-by-function statement in writing). Rather, "the ALJ need only articulate how the evidence in the record supports the RFC determination, discuss the claimant's ability to perform sustained work-related activities, and explain the resolution of any inconsistencies in the record." *Id.* at 548 (citation omitted); *see also Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 729 (6th Cir. 2013) (SSR 96–8p merely requires

the ALJ to "address a claimant's exertional and nonexertional capacities and also describe how the evidence supports h[is] conclusions"). The Court finds the ALJ's analysis is sufficient to pass muster under SSR 96–8p.

        *C.*      *The ALJ's Evaluation of Dr. Larry Irey's Opinion.*

Next, Plaintiff contends the ALJ failed to properly incorporate the moderate mental limitations offered by Dr. Larry Irey, Ph.D., a non-examining agency consultant. The regulations provide that the agency will evaluate every medical opinion received "[r]egardless of its source," and that unless a treating source's opinion is given controlling weight, the agency will consider the factors set forth in § 405.1527(c)(1)-(6) in deciding the weight given to any medical opinion. *See* 20 C.F.R. § 404.1527(c). While the ALJ is required to give "good reasons" for the weight assigned a treating source's opinion, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004), this articulation requirement does not apply when an ALJ rejects the report of a non-treating medical source. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007); *see also Perry ex rel. G.D. v. Comm'r of Soc. Sec.*, 501 F. App'x 425, 426 (6th Cir. 2012). However, "the ALJ's decision still must say enough to allow the appellate court to trace the path of his reasoning." *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011) (internal quotation marks omitted)

Dr. Irey's assessment began by responding to questions that asked for his opinion regarding the severity of Plaintiff's functional limitations in an area commonly referred to as "paragraph B" criteria. Dr. Irey indicated that Plaintiff had mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. Furthermore, Dr. Irey stated that Plaintiff had suffered one or two episodes of decompensation, each of extended duration. (PageID.105.) Dr. Irey then was asked to

complete questions regarding Plaintiff's mental RFC. On many of these questions, Dr. Irey answered that Plaintiff had moderate restrictions.[2] The form cautioned that "[t]he questions below help determine the individual's ability to perform sustained work activities. However, *the actual mental residual functional capacity assessment is recorded in the narrative discussion(s),* which describes how the evidence supports each conclusion." (PageID.107) (emphasis added). Dr. Irey provided four narrative statements.

Regarding Plaintiff's understanding and memory limitations, Dr. Irey remarked that Plaintiff retained the capacity to understand and remember simple 1-2 step instructions. (PageID.108.) As for Plaintiff's sustained concentration and persistence limitations, Dr. Irey wrote that Plaintiff retained the capacity to perform simple tasks. (PageID.108.) Furthermore, Dr. Irey remarked that Plaintiff's limitations in social interaction nonetheless allowed Plaintiff to engage in routine work related interactions. (PageID.109.) Finally, Dr. Irey stated that to account for Plaintiff's adaptive limitations, Plaintiff should be limited to jobs that are considered relatively low stress with duties that remain relatively static over time. (PageID.109.). After summarizing the doctor's opinion, the ALJ gave the opinion partial weight. He found that "Dr. Irey's conclusions that the claimant was limited to simple work is consistent with the record, but the conclusion that the claimant had experienced one or two episodes of decompensation, each of extended duration is not supported by the record." (PageID.45.) Plaintiff points out that the ALJ only specifically rejected

---

[2] Specifically, Dr. Irey's completed assessment notes that Plaintiff was not significantly limited in the ability to understand, remember, and carry out very short and simple instructions, but was moderately limited in the ability to do so with detailed instructions. (PageID.108.) Furthermore, Plaintiff was moderately limited in the ability to maintain attention and concentration for extended periods and also moderately limited in the ability to complete a normal workday and workweek without interruptions from his psychological symptoms and he was similarly limited regarding his ability to perform at a consistent pace without an unreasonable number and length of rest periods. (PageID.108.) Dr. Irey also indicated Plaintiff was moderately limited in his ability to interact appropriately with the general public, and moderately limited in the ability to respond appropriately to changes in the work setting. (PageID.109.)

the doctor's conclusions regarding the paragraph b criteria. Accordingly, Plaintiff contends, the ALJ should have included the moderate limitations in his RFC assessment.

As the Commissioner points out, a vague assertion that Plaintiff might be moderately limited does not necessarily indicate that Plaintiff is unable to adequately function in a specific area. Moreover, the plain text of assessment questionnaire states that the actual functional capacity assessment should be found from the doctor's answers to the narrative discussion questions. Plaintiff does not argue that the ALJ's RFC assessment is in any way inconsistent with these narrative answers. In short, the Court is able to trace the path of the ALJ's reasoning here and the ALJ properly evaluated this opinion under agency regulations. Plaintiff's claim of error will be denied.

### 2. The ALJ's Credibility Evaluation.

As noted above, Plaintiff applied for disability benefits on October 29, 2013, alleging disability beginning May 6, 2013. (PageID.100–101.) During the second quarter of 2014, well after Plaintiff's alleged disability onset date, Plaintiff received unemployment benefits. (PageID.172–173.) After noting Plaintiff had received these benefits, the ALJ discounted Plaintiff's credibility, in part, by stating that "[i]n order to receive unemployment benefits, the claimant would have had to attest that he was ready, willing, and able to work. This is inconsistent with his allegations of disabling symptoms." (PageID.44.)

This district, as well as the Sixth Circuit, has recognized the apparent contradiction between a claimant seeking disability benefits while simultaneously receiving unemployment compensation. *See, e.g.*, *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 801–802 (6th Cir. 2004); *see also Loyacano v. Comm'r of Soc. Sec.*, No. 1: 13–cv–144, 2014 WL 1660072, at *5

13

(W.D. Mich. Apr. 25, 2014) (collecting cases); *Smith v. Comm'r of Soc. Sec.*, No. 1:12–cv–904, 2014 WL 197846, at * 16 (S.D. Ohio Jan. 15, 2014); *Barton v. Astrue*, No. 3:11–cv–1239, 2013 WL 6196297, at * 7 (M.D. Tenn. Nov. 27, 2013). Plaintiff argues, however, that this line of cases no longer applies due to subsequent developments in agency policy. Specifically, Plaintiff points to an August 2010, memorandum from Frank A. Cristaudo, the Chief Administrative Law Judge for the Social Security Administration. That memo instructs ALJs that "the receipt of unemployment benefits does not preclude the receipt of Social Security disability benefits. The receipt of unemployment benefits is only one of many factors that must be considered in determining whether the claimant is disabled." *Webster v. Colvin*, 2014 WL 4095341, at *9 (E.D. Tenn., Aug. 19, 2014). As Chief ALJ Cristaudo explained, "because the disability decisionmaking process is uncertain and quite lengthy, a claimant should not be forced to choose between applying for unemployment and disability benefits." *Id.*

Plaintiff argues that this memo precludes consideration of a claimant's receipt of unemployment benefits. Here, the ALJ did not base the credibility determination solely on Plaintiff's receipt of unemployment benefits. Rather, the ALJ also noted that other factors, including Plaintiff's daily activities and medical history, combined with the receipt of unemployment benefits stood at odds with his disability claim. (PageID.43–44.) This was entirely appropriate, and Plaintiff does not address the other considerations provided by the ALJ for discounting Plaintiff's credibility. Moreover, Plaintiff's interpretation of the memo overreads the Administration's policy. As the memo itself states, the receipt of unemployment benefits is a factor that may be considered. As such, the deference generally accorded an ALJ's credibility determination is appropriate here. This claim of error will be denied.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that the ALJ's decision is **AFFIRMED.** A separate judgment shall issue.

Dated: May 23, 2017   /s/ Robert J. Jonker
ROBERT J. JONKER
CHIEF UNITED STATES DISTRICT JUDGE